# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| ANDRE L. GRANT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:16-cv-00100-SLC |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, *sued as Nancy A.* | ) | |
| *Berryhill, Acting Commissioner of SSA,*[1] | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Andre L. Grant appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying his application under the Social

Security Act (the "Act") for Supplemental Security Income ("SSI").[2] (DE 1). For the following

reasons, the Commissioner's decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

Grant applied for SSI in March 2014, alleging disability as of January 12, 2009.[3] (DE 12

Administrative Record ("AR") 219-26, 253-54). The Commissioner denied Grant's application

initially and upon reconsideration. (AR 146-51, 155-57). Grant later amended his onset date to

February 12, 2014. (AR 41).

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security, *see Casey v. Berryhill*, 853 F.3d 322 (7th Cir. 2017), and thus, she is automatically substituted for Carolyn W. Colvin in this case, *see* Fed. R. Civ. P. 25(d).

[2] All parties have consented to the Magistrate Judge. (DE 15); *see* 28 U.S.C. § 636(c).

[3] Grant also applied for Disability Insurance Benefits ("DIB"), but he later dismissed his claim for DIB when he amended his alleged onset date. (AR 41).

A hearing was held on July 2, 2015, before Administrative Law Judge William D. Pierson ("the ALJ"), at which Grant, who was represented by counsel; his friend, Annette Redfield; and a vocational expert, Marie Kieffer (the "VE"), testified. (AR 38-89). On September 17, 2015, the ALJ rendered an unfavorable decision to Grant, concluding that he was not disabled because despite the limitations caused by his impairments, he could perform his past relevant work as a parts hanger and industrial cleaner, as well as a significant number of other unskilled, medium exertional jobs in the economy. (AR 18-31). The Appeals Council denied Grant's request for review (AR 1-15), at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481.

Grant filed a complaint with this Court on January 21, 2016, seeking relief from the Commissioner's final decision. (DE 1). Grant advances four arguments in this appeal: (1) that new evidence submitted to the Appeals Council requires a remand; (2) that the ALJ failed to properly evaluate whether he met Listing 12.04, the affective disorders listing; (3) that the ALJ failed to adequately account for his mental and physical limitations in the residual functional capacity ("RFC"); and (4) that the ALJ failed to properly weigh certain opinion evidence. (DE 20 at 12-25).

## II. FACTUAL BACKGROUND[4]

At the time of the ALJ's decision, Grant was 59 years old (AR 31, 219); had a high school education; and possessed past relevant work experience as a parts hanger in a factory, and in various jobs in factories and warehouses through a temporary agency (AR 259). In his application, Grant alleged disability due to heart problems; pain in his feet, legs, and right arm;

---

[4] In the interest of brevity, this Opinion recounts only the portions of the 875-page administrative record necessary to the decision.

and post traumatic stress disorder ("PTSD").  (AR 258).

*A.  Grant's Testimony at the Hearing*

At the hearing, Grant testified as follows:  Grant lives alone in an apartment, but he stays with his friend, Ms. Redfield, three to four days a week.  (AR 43, 74-75).  Grant's apartment is paid for by a program through Park Center, and he also receives a monthly bus pass and a stipend for food.  (AR 43-45).  Grant's driver's license was suspended 10 years earlier after an accident, so he takes the bus or his friends drive him places.  (AR 44-45, 74).  For the past 20 to 30 years, he used cocaine and consumed a liter of vodka on a daily basis; however, he had been clean since his hospitalization in February 2014.  (AR 46, 54, 57-58).  Grant claims his PTSD started after he saw someone being killed in 2006.  (AR 55).

Grant testified that his anxiety, his fear of being out in public and around people, and his nightmares all increased after he "got clean" in February 2014 and stopped self-medicating with alcohol and illegal drugs.  (AR 55, 58).  He started therapy at Park Center about a month after his February 2014 hospitalization, which is when Park Center got him into the free housing program.  (AR 56-57).  The program requires a home visit once a month and a counseling session every two weeks.  (AR 57, 61).  Park Center staff also assist Grant with making and keeping appointments.  (AR 56-57).  Grant goes to Carriage House three to five times a week, where he socializes with other people suffering from mental illness and participates in programs designed to support such individuals.  (AR 59-60).

When asked why he thought he could not work, Grant cited his lack of concentration, his nightmares, and his fear of being around large groups of people.  (AR 61, 63).  He does not go to the mall or the grocery store by himself due to his fear of being out in public.  (AR 63).  Grant

has nightmares that disrupt his sleep two to three times a week, so he naps during the day. (AR 62-63).

As to his physical condition, Grant complained of having problems with his feet in that they feel like "blocks," which sometimes causes him to stumble. (AR 65). He elevates his feet when he is at home. (AR 65-66). He has been told that his foot problem is due to having poor circulation. (AR 66). He wears plastic foot braces bilaterally that extend eight inches up his ankles. (AR 67-68). Grant estimated that he could stand for two to four hours before needing to elevate his feet for the rest of the day; walk for 45 minutes or four to five blocks; and lift three gallons of milk, stating that his balance interferes with his ability to pick up heavier items.[5] (AR 69-73).

### B. Summary of the Relevant Medical Evidence Pertaining to Grant's Physical Health

On March 3, 2014, Grant underwent cardiac testing through Matthew 25 Clinic, which was negative for ischemia at 68% predicted heart rate. (AR 479). An examination revealed decreased sensation in his feet to below his ankles. (AR 467). His impairments included peripheral neuropathy, gastroesophageal reflux disease ("GERD"), a history of hepatitis C, and atypical chest pain. (AR 466). He had no limitation in walking, but did complain of difficulty with standing due to pain in his ankles. (AR 466). In April 2014, Grant obtained shoe inserts for bilateral arch pain. (AR 464).

On June 18, 2014, Grant was seen by Dr. Gage Caudell, a podiatrist, at Fort Wayne Orthopedics regarding his bilateral foot pain, which worsened with prolonged standing, lifting,

---

[5] Grant's friend, Ms. Redfield also testified at the hearing, essentially corroborating Grant's testimony. (AR 74-80). She also said that sometimes he needs reminders to shower or to shave, and to turn off the stove when cooking. (AR 78).

or carrying. (AR 550-52). X-rays of Grant's feet showed narrowing to the mid-foot joints and calcification of the vessels. (AR 551). Dr. Caudell diagnosed posterior tibial tendinitis with associated flat feet. (AR 551). He prescribed lace-up ankle braces for Grant. (AR 551). At a return visit one month later, Grant was doing better, reporting that the ankle braces were helping. (AR 854).

On June 25, 2014, Grant was examined by Dr. H.M. Bacchus for purposes of his disability application. (AR 565-57). The examination was generally unremarkable, other than a depressed mood and a flat affect. (AR 566). Dr. Bacchus's impressions were: heart problems; PTSD per history, treated and monitored; GERD, treated; and pain in feet, right arm, and legs per history. (AR 566). Dr. Bacchus opined that Grant had the physical functional capacity to perform regular duties, that he appeared stable currently in regard to his heart, and that a mental health evaluation would be beneficial. (AR 566).

On June 30, 2014, Dr. J.V. Corcoran, a state agency physician, reviewed Grant's records and concluded that he could lift 25 pounds frequently and 50 pounds occasionally; stand or walk six hours in an eight-hour workday; and sit for six hours in an eight-hour workday. (AR 95-96). Another state agency physician, Dr. J. Sands, affirmed Dr. Corcoran's assessment on September 10, 2014. (AR 131).

On July 15, 2014, Grant presented to Dr. Mark Dickmeyer for initiation of primary care. (AR 772). Grant reported that he had been doing fairly well since his February 2014 hospitalization, though he expressed concerns about having symptoms of tinnitus and some gait instability that occurred later in the day when his legs feel swollen and "blocklike." (AR 772). Dr. Dickmeyer observed no peripheral edema, and Grant's pedal pulses were good bilaterally.

(AR 773). His lower extremity strength was normal, and his gait was slightly wide-based but stable. (AR 773). Dr. Dickmeyer prescribed medications, including aspirin and Coreg for coronary artery disease. (AR 77-374). A hepatitis function panel was positive for hepatitis C. (AR 774-75). Dr. Dickmeyer included "[d]izziness with a subjective sense of gait disturbance" in Grant's diagnoses. (AR 774).

On October 16, 2014, Grant returned to Dr. Dickmeyer, complaining of right shoulder stiffness and intermittent stiffness of his lower body, which was causing him to stumble. (AR 779). Grant had also been having some lightheaded spells, particularly when he stood up abruptly. (AR 779). On examination, Grant demonstrated a slight limitation in abduction and rotation of his right shoulder, but without pain or tenderness. (AR 780). Dr. Dickmeyer referred Grant to a gastroenterologist for his hepatitis C. (AR 371, 570, 780). On March 19, 2015, Grant saw Dr. Dickmeyer for complaints of headaches. (AR 785). He was prescribed medications. (AR 786).

On May 29, 2015, Grant returned to Dr. Caudell, reporting that he attempted to exercise when the weather got better, which increased his bilateral foot pain. (AR 850-52). He stated that it felt like he had "no circulation" and that there were "cement blocks on his feet," which then caused him balance problems. (AR 850). He reported that his foot pain and his balance had worsened since his last visit. (AR 850). Dr. Caudell prescribed custom AFO short braces and ordered an arterial ultrasound. (AR 851-52). A Doppler ultrasound revealed no flow limiting stenotic disease. (AR 844-46). Grant returned to Dr. Caudell in July. (AR 843). At that visit, Dr. Caudell assessed bilateral posterior tendinitis with associated flatfoot and pain in his lower extremities, which could be peripheral artery disease. (AR 843). Dr. Caudell recommended that

Grant have his right AFO adjusted, and that Grant consider surgery in the future if his braces failed to sufficiently alleviate his symptoms. (AR 843).

### C. Summary of the Relevant Medical Evidence Concerning Grant's Mental Health

On February 3, 2014, Grant presented to the emergency room for complaints of chest pain, reporting that he had used large amounts of cocaine and alcohol. (AR 394). His physical and mental exams were normal. (AR 395). Grant was transferred to a substance abuse treatment facility. (AR 417, 421-22).

On February 7, 2014, Grant was evaluated by James Keifer, a clinical social worker at Park Center, as a follow up to his recent mental health hospitalization. (AR 490-98). Grant reported seven past inpatient stays for substance-related treatment and a history of six to eight substance-related arrests. (AR 493). Mr. Keifer noted that Grant had poor judgment and minimal insight, given his extensive history of alcohol and drug use. (AR 494-95). Grant's mood and affect were depressed, but his thought content and memory were normal. (AR 494). Grant was diagnosed with polysubstance dependence and PTSD. (AR 497).

On May 8, 2014, Richard Hite, Ph.D., a psychologist at Park Center, completed a one-page "Permanent Supportive Housing Verification of Disability Form," representing that Grant was a homeless person with a qualifying disability. (AR 804). For purposes of qualifying for occupancy in the program, the disability could be a mental, emotional, or physical impairment or chronic problems with alcohol or drugs. (AR 804).

Treatment records from Park Center reveal that Grant was seen for medication management and for skills training and development from May 2014 through May 2015. (AR 596-737). The treatment plan focused on Grant's decision making, self organization, and

managing his health needs and daily activities. (AR 596-737). By June 2014, Grant reported to Park Center staff that he was "doing well," that things were "going good" for him, and that his medications and anxiety were "well-managed." (AR 632, 646). In May 2015, Grant reported to Park Center staff that being in crowds and riding a noisy bus was still a problem for him, but that he was able to attend classes, was focusing on self improvement, and was enjoying socializing at the Carriage House. (AR 709). Park Center staff indicated that Grant was "coping well" at the time. (AR 709).

On June 23, 2014, Grant was examined by Alan Kirk Stage, Ph.D., for purposes of his disability application. (AR 560-63). He presented with a flat affect, and his presentation suggested feelings of anxiety and depression. (AR 561). His behavior suggested mild difficulties with inattention and distractibility due to anxiety. (AR 561). A mental status exam indicated that his immediate memory, recent memory, and working memory were low average; his remote memory was intact. (AR 563). His serial ability and verbal abilities were also low average. (AR 563). Dr. Stage assessed that Grant appeared to be experiencing longstanding feelings of anxiety and depression since witnessing a fatal stabbing in 2006. (AR 563). Dr. Stage diagnosed Grant with PTSD; major depressive disorder, moderate; and a substance-related disorder. (AR 563).

On June 25, 2014, Ken Lovko, Ph.D., a state agency psychologist, reviewed Grant's records and found that he was moderately limited in understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; maintaining socially appropriate

behavior and adhering to basic standards of neatness and cleanliness; responding appropriately to changes in the work setting; and setting realistic goals or making plans independently of others. (AR 108-10). Dr. Lovko concluded in his narrative that Grant could "understand, remember, and carry-out unskilled tasks without special considerations in many work environments," "relate on at least a superficial and ongoing basis with co-workers and supervisors," "attend to task for sufficient periods of time to complete tasks," and "manage the stresses involved with unskilled work." (AR 110).

On September 10, 2014, Maura Clark, Ph.D., another state agency psychologist, affirmed Dr. Lovko's assessment. (AR 119-20, 123-25, 132). Dr. Clark further concluded that Grant did not satisfy the "A" diagnostic criteria of Listings 12.04, Affective Disorders, or 12.06, Anxiety-Related Disorders. (AR 32, 119). In assessing the "B" criteria of these listings, Dr. Clark found that Grant had moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace; and mild restrictions in activities of daily living. (AR 119-20, 132). Dr. Clark found that the evidence also did not establish the presence of "C" criteria. (AR 120, 133).

In May 2015, Stacey Ruiz, a clinician at Park Center, documented that Grant was attending school and performing his assignments for a college course. (AR 636). Grant stated that he really wanted to focus on his classes. (AR 637).

On June 24, 2015, Paula Martin, MS, LSW, LMHC, a clinical social worker at Park Center, completed a mental medical source statement on Grant's behalf. (AR 793-98). She indicated diagnoses of PTSD and dysthymic disease. (AR 793). As clinical findings, she reported that Grant had received addiction treatment at various institutions and that he has

depression, anxiety, sleep issues, and flashbacks.  (AR 793).  She identified his symptoms as suicidal thoughts, a blunt affect, difficulty concentrating, persistent mood or affect disturbances, paranoid thinking, irrational fear of a specific situation, and sleep disturbance.  (AR 794).  She opined that in a normal workday and workweek, Grant could:  (1) for 80 to 89% of the time, remember work-like procedures, understand and remember simple instructions, carry out simple instructions, maintain attention for two-hour periods, make simple work-related decisions, ask simple questions, accept instructions and respond appropriately to criticism, be aware of normal hazards and take appropriate precautions, set realistic goals or make plans independently of others, and adhere to basic standards of neatness and cleanliness; (2) for 70 to 79% of the time, maintain regular attendance and be punctual, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without undue distraction, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, get along with coworkers without unduly distracting them or exhibiting behavioral extremes, respond appropriately to changes in a routine work setting, deal with normal work stress, understand and remember detailed instructions, carry out detailed instructions, deal with stress of semiskilled and skilled work, interact appropriately with the general public, and maintain socially appropriate behavior; and (3) for less than 70% of the time, travel to unfamiliar places or use public transportation.  (AR 795-96).

Additionally, Ms. Martin opined that Grant would find working with other people, dealing with the public, and a lack of meaningfulness of work to be stressful.  (AR 796).  She assessed that Grant had marked difficulties in maintaining social functioning; marked deficiencies of

concentration, persistence, or pace; moderate restrictions of activities of daily living; and one or two episodes of decompensation. (AR 797). Ms. Martin indicated that Grant had a history of one or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such living arrangement. (AR 797). She estimated that Grant's impairments would cause him to be absent from work more than four days a month. (AR 798). Finally, Ms. Martin represented that alcohol or substance abuse did not contribute to any of the limitations that she had set forth in the mental medical source statement. (AR 798). Karen Lothamer, a psychiatric nurse practitioner, and Dr. Lambertson counter-signed the mental medical source statement. (AR 798).

### D. Additional Mental Health Evidence Submitted to the Appeals Council

The following additional mental health records were submitted to the Appeals Council after the ALJ issued his decision:

Grant was seen at Park Center for continued skills training and development on June 1, June 19, June 22, and July 9, 2015. (AR 857-59, 865-70). He was attending Carriage House three to four times a week and was trying to work out twice a week to help with stress reduction. (AR 866). He reported feeling stressed by recent fireworks due to his sensitivity to loud noises. (AR 870). Grant failed to appear for his appointment on June 15, 2015, and he rescheduled his appointment set for July 23, 2015. (DE 860-64). He was coached on keeping appointments. (AR 870).

On October 19, 2015, Ms. Martin penned a letter, indicating that Grant was diagnosed with PTSD, resulting in recurrent and intrusive recollections of events, intrusive thoughts and images, difficulty with concentration, and hyper-vigilance. (AR 872-73). He was attacked by a

gang in 2001 and witnessed a murder, contributing to his paranoia.  (AR 872).  She stated that his

disturbances cause clinically significant distress or impairment in his social, occupational, or

other functioning.  (AR 872).  Ms. Martin indicated that Grant had been diagnosed with

dysthymia, that he has a depressed mood more days than not, that he has low energy and feelings

of hopelessness, and that he isolates himself.  (AR 872).  She noted his extensive past history for

addiction and that he had been in prison on and off since the age of 22.  (AR 872).

On November 16, 2015, Ms. Lothamer wrote a letter, addressing "discrepancies" in her

records concerning Grant.  (AR 875).  She explained that in her notes, she checks boxes to

indicate how a client presents during a 15-minute medication management appointment.  (AR

875).  She further explained that she checked boxes in Grant's notes indicating that he appears

and acts appropriately during her appointments; she clarified, however, that without the support

of case management, supported living, therapy, and medication management, "that would not be

the case for this client."  (AR 875).  Ms. Lothamer referred the reader for more information to Ms.

Martin's mental medical source statement dated June 24, 2015; to Ms. Martin's letter dated

October 19, 2015; and to Grant's medical records.  (AR 875).

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the

Commissioner of Social Security, with or without remanding the cause for a rehearing."  42

U.S.C. § 405(g); *see* 42 U.S.C. § 1383(c)(3).  The Court's task is limited to determining whether

the ALJ's factual findings are supported by substantial evidence, which means "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."  *Schmidt v.*

*Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Id.* Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Id.*

## IV. ANALYSIS

### A. The Law

Under the Act, a plaintiff is entitled to SSI if he "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D).

In determining whether Grant is disabled as defined by the Act, the ALJ conducted the familiar five-step analytical process, which required him to consider the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App'x 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of

13

performing work in the national economy.[6] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Id.* at 885-86.

### B. The Commissioner's Final Decision

On September 17, 2015, the ALJ issued the decision that ultimately became the Commissioner's final decision. (AR 18-31). At step one of the five-step analysis, the ALJ found that Grant had not engaged in substantial gainful activity since February 12, 2014, his amended alleged onset date. (AR 21). At step two, the ALJ found that Grant had the following severe impairments: bilateral posterior tibial tendinitis with associated flatfeet, moderate left ventricular hypertrophy, dysthymic disorder, PTSD, and polysubstance dependence. (AR 21).

At step three, the ALJ concluded that Grant did not have an impairment or combination of impairments severe enough to meet or equal a listing. (AR 21-23). Before proceeding to step four, the ALJ determined that Grant's symptom testimony was credible in so far as it was consistent with the following RFC (AR 26):

> [T]he claimant has the [RFC] to perform medium work . . . except
> the claimant can: lift, carry, push, pull, 25 pounds frequently, 50
> pounds occasionally, sit 6 hours out of an 8 hour workday; stand
> and/or walk 6 hours out of an 8 hour workday[.] The claimant is
> limited to superficial interaction with coworkers, supervisors and

---

[6] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 416.920(e), 416.945. The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 416.920(e), 416.945(a)(5).

the public, with superficial interaction defined as occasional and casual contact not involving prolonged conversation. Contact with supervisors still involves necessary instruction. The claimant is limited to work that involves only simple, routine and repetitive tasks that can be learned with short demonstration up to thirty days. The claimant can maintain the concentration required to perform simple tasks. The claimant can remember simple work like procedures. The claimant can make simple work related decisions. The claimant is limited to work within a low stress job defined as requiring only occasional decision making and only occasional changes in the work setting. The claimant can tolerate predictable changes in the work environment. The claimant can meet production requirements in an environment that allows him to sustain a flexible and goal oriented pace. The claimant is limited from fast-paced work such as assembly line production work with rigid or strict productivity requirements.

(AR 23).

At step four, the ALJ found that Grant was capable of performing his past relevant work as a parts hanger and industrial cleaner, as it is generally and actually performed. (AR 30). The ALJ further concluded at step five that based on the RFC and the VE's testimony, Grant could perform a significant number of other jobs in the economy, including packager, cooks helper, and conveyer tender. (AR 30). Therefore, Grant's application for SSI was denied. (AR 31).

*C. The Evidence Submitted to the Appeals Council Does Not Require a Remand*

Grant first argues that the Appeals Council committed a legal error in denying Grant's request for review by failing to consider whether the ALJ's decision was contrary to the weight of the evidence, including the newly submitted records from Park Center. This additional evidence consists of several Park Center treatment notes from June and July 2015, a letter from Ms. Martin dated October 19, 2015, and a letter from Ms. Lothamer dated November 16, 2015. (AR 857-75). Grant asserts that had the Appeals Council reviewed this additional evidence, the Appeals Council would have concluded that the additional evidence was both new and material, and that

15

the additional evidence required a remand of the ALJ's decision.

When a claimant provides additional evidence to the Appeals Council, the Council "must determine (i) whether the proffered new evidence relates to the proper time period and (ii) whether the evidence is 'new' and 'material.'" *Binzen v. Barnhart*, No. 01 C 2716, 2002 WL 31324061, at *1 (N.D. Ill. Oct. 16, 2002) (quoting *Perkins v. Chater*, 107 F.3d 1290, 1294 (7th Cir. 1997)); *see Getch v. Astrue*, 539 F.3d 473, 483-84 (7th Cir. 2008); 20 C.F.R. § 416.1570(b). "If the Appeals Council answers both of these questions in the affirmative it must then determine whether the ALJ's decision is contrary to all of the evidence, i.e., the evidence before the ALJ and the new and material evidence submitted to the Appeals Council." *Binzen*, 2002 WL 31324061, at *1. "If the Appeals Council denies review at this stage—essentially reasoning that all of the evidence does not undermine the ALJ's decision—then the Council's decision is unreviewable[,]" *id*. (citing *Perkins*, 107 F.3d at 1294), provided, however, that the refusal does not rest on a mistake of law, such as a determination that the evidence newly submitted to the Appeals Council was not material to the disability determination. *See Eads v. Sec'y of the Dep't of Health & Human Servs.*, 983 F.2d 815, 817 (7th Cir. 1993).

Here, in its Notice of Appeals Council Action, the Appeals Council stated that it considered the additional evidence submitted by Grant, but it concluded that the additional evidence "does not provide a basis for changing the [ALJ's] decision." (AR 2). The Commissioner concedes that this language is akin to that criticized by the Seventh Circuit Court of Appeals in *Stepp v. Colvin*, 795 F.3d 711 (7th Cir. 2015). In *Stepp*, the Court found that the Appeals Council's language was not sufficiently clear regarding whether it had denied review because it found that the additional evidence was not new or material at step one, or because the

additional evidence did not render the ALJ's decision contrary to the weight of the evidence at step two. *Id*. at 723. As such, the Seventh Circuit found that a *de novo* review of the Appeals Council's determination concerning whether the additional evidence qualifies as "new and material" under 20 C.F.R. § 404.970(b) was necessary. *Id*. at 725; *see also Farrell v. Astrue*, 692 F.3d 767 (7th Cir. 2012) (finding that the Appeals Council's decision stating that it "considered . . . the additional evidence . . . [and] found that this information does not provide a basis for changing the [ALJ's] decision" was unclear, necessitating the Court's *de novo* review of the Appeals Council's determination (first three alterations in original)).

Employing a *de novo* review here, the Court concludes that the additional evidence submitted by Grant does not qualify as "new and material." "'[M]ateriality' means that there is a 'reasonable probability' that the Commissioner would have reached a different conclusion had the evidence been considered, and 'new' means 'evidence not in existence or available to the claimant at the time of the administrative proceeding.'" *Perkins*, 107 F.3d at 1296 (quoting *Sample v. Shalala*, 999 F.2d 1138, 1144 (7th Cir. 1993)). The information in Ms. Martin's and Ms. Lothamer's letters merely summarizes the evaluation and treatment information contained in their treatment notes that was already included in the record. Thus, these letters were not based on any new evidence or recently-discovered findings that were unavailable to Grant prior to the administrative proceedings. (AR 1123); *compare Sears v. Bowen*, 840 F.2d 394, 399 (7th Cir. 1988) (finding that a psychological evaluation performed after the ALJ's decision was new evidence as "it was not in existence at the time of the administrative proceedings" (citations omitted)), *with Sampl*e, 999 F.2d at 1144 (emphasizing that a physician's report derived from medical evidence already in the record did not constitute new information); *see also Perkins*, 107

F.3d at 1296; *Harris v. Barnhart*, No. 03 C 3185, 2005 WL 1655202, at *15 (N.D. Ill. April 26, 2005) ("Evidence is new if it is not merely cumulative." (citing *Sears*, 840 F.2d at 399)).

Nor are Ms. Martin's and Ms. Lothamer's letters "material." The letters merely repackage information contained in Ms. Martin's mental medical source statement dated June 24, 2015. In fact, Ms. Lothamer's letter even refers the reader to that mental medical source statement. Neither Ms. Martin nor Ms. Lothamer provide any additional clinical findings in their letters. As such, these letters are cumulative. Accordingly, there is not a reasonable probability that the ALJ would have reached a different conclusion if these letters were considered, *see Perkins*, 107 F.3d at 1296, and thus, they are not material.[7]

And even if the additional Park Center treatment records for June and July 2015 were "new" evidence, since they documented additional treatment sessions, these records were not "material." These records merely summarize several additional sessions of skills training and development in June and July 2015, all of which were similar to Park Center's earlier treatment records that were before the ALJ. Records that "document new treatment for 'the very same ailments' at issue in the underlying disability proceedings" are not material. *Bybee v. Astrue*, No. 1:11-cv-271, 2011 WL 6151603, at *4 (S.D. Ind. Dec. 9, 2011) (citing *Schmidt*, 395 F.3d at 742).

In sum, Grant fails to establish that the additional evidence submitted to the Appeals Council constitutes new and material evidence, and that the ALJ's decision is contrary to all of the evidence, including this additional evidence submitted to the Appeals Council. Consequently, Grant's first argument fails to warrant a remand of the ALJ's decision.

---

[7] Furthermore, Grant fails to show good cause as to why these letters were not produced during the pendency of the proceedings. *See* 42 U.S.C. § 405(g).

### D.  The ALJ's Step-Three Determination That Grant Did Not Meet or Equal Listing 12.04 Is Supported by Substantial Evidence

Next, Grant contends that the ALJ erred by failing to conclude that he met or equaled Listing 12.04, the affective disorders listing.  More specifically, Grant argues that the ALJ erred when considering the "B" and "C" criteria of Listing 12.04:  (1) by failing to properly take into account that he lived in a highly supportive living arrangement; (2) by failing to adequately consider the treating source opinions; and (3) by "relying upon boilerplate alone" to analyze whether he satisfied the "C" criteria.  (DE 20 at 17).

The claimant bears the burden of proving that his impairments meet or equal each element of a listed impairment.  *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999) ("The claimant bears the burden of proving his condition meets or equals a listed impairment." (citation omitted)); *see also Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012).  To satisfy Listing 12.04, a claimant must meet the "A" criteria and also either the "B" or "C" criteria.  *See Herron v. Comm'r of Soc. Sec.*, 788 F. Supp. 2d 809, 816 (N.D. Ind. 2011) (citing 20 C.F.R. Pt. 404, Subpt. P, App'x 1, 12.04)).  The Commissioner does not dispute Grant's assertion that he satisfies the "A" criteria of Listing 12.04.  (DE 20 at 16).  The "B" criteria requires "mental impairments result[ing] in at least two of the following problems:  (1) marked restriction in activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation."  *Sims v. Barnhart*, 309 F.3d 424, 431 (7th Cir. 2002) (citing 20 C.F.R. Pt. 404, Subpt. P, App'x 1, §§ 12.02B, 1204B, 12.06B)); (*see also* DE 20-1 at 1-2).  The "C" criteria requires:

> Medically documented history of a chronic affective disorder of at
> least 2 years' duration that has caused more than a minimal
> limitation of ability to do basic work activities, with symptoms or
> signs currently attenuated by medication or psychosocial support,
> and one of the following:  1. Repeated episodes of
> decompensation, each of extended duration; or 2. A residual

disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in environment would be predicted to cause the individual to decompensate; or 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

*Herron*, 788 F. Supp. 2d at 817 n.3.

Grant argues that when considering the "B" and "C" criteria of Listing 12.04, the ALJ failed to sufficiently take into account that Grant lives in a highly supportive living arrangement. More particularly, Grant views the ALJ's finding that Grant had mild restrictions in activities of daily living as inconsistent with the fact that he qualified based on his mental illness to live in supportive housing, where he receives assistance with his daily activities from social workers and case managers.

However, the ALJ did not ignore the fact that Grant was living in a type of supportive living arrangement where he receives counseling and socialization. (AR 24). Rather, the ALJ inquired into the circumstances of the housing program at the hearing. (AR 57). In response, Grant testified that the program requires just one home visit per month and participation in counseling every two weeks. (AR 57). The ALJ apparently concluded, then, that Grant's living situation was less than "highly" supportive. Rather, the ALJ observed that Grant was able to attend classes, shop, use public transportation, play games, wash dishes, attend meetings, attend church, and was generally "coping well." (AR 22, 24, 26). The ALJ also noted that Grant stopped working in shipping and receiving in 2011 because he was laid off, not because of any impairment. (AR 26). Furthermore, Dr. Clark, a reviewing state agency psychologist, opined that Grant had just mild restrictions in activities of daily living. (AR 132). Likewise, Grant told Dr. Stage that he performed most daily living tasks independently. (AR 561). Therefore, on this

record, the ALJ's conclusion that Grant had minimal restrictions in activities of daily living has sufficient support.

Grant also argues that the ALJ improperly assessed that he had just moderate limitations in social functioning and moderate limitations in concentration, persistence, or pace. But the ALJ adequately supported his finding of moderate limitations in these areas as well. The ALJ considered that although Grant claimed difficulty in getting along with others, he was still able to attend church, attend Alcoholics Anonymous meetings, and regularly socialize with others at the Carriage House. (AR 22, 270-71). In fact, Grant told Dr. Stage that he generally gets along well with others, even though he tends to be socially withdrawn. (AR 561). The ALJ also considered that Dr. Stage found that Grant had just mild deficits in distraction and inattention due to anxiety. (AR 26, 561). The ALJ further observed that Grant had improved significantly within several months of his alleged onset date after beginning treatment with Park Center. (AR 26). In fact, by May 2015, Grant reported that he was coping well, enjoying school, and that his classes helped with his focus and concentration. (AR 26, 29). Therefore, the ALJ adequately supported his determination regarding the "B" criteria of Listing 12.04.

While Grant contends that the ALJ gave a "lack of attention" to the testimony of Ms. Redfield and to the third-party statement from Constance Cobb (AR 284-91) about his activities of daily living, socialization, and concentration, that assertion is unpersuasive as the ALJ considered this evidence in some detail (AR 22, 24, 28). The ALJ concluded, however, that the statements from these witnesses appear to be "mere extensions" of Grant's own allegations, and as such, were proffered only "some" weight. (AR 28-29). Thus, to the extent that the ALJ found Grant's testimony not entirely credible, "he necessarily found the third-party statements unconvincing." *Karger v. Astrue*, 566 F. Supp. 2d 897, 907 (W.D. Wis. 2008) (citing *Books v.*

*Chater*, 91 F.3d 972, 980 (7th Cir. 1996)).

Grant also argues that the ALJ improperly relied "upon boilerplate alone" to analyze whether Grant met the "C" criteria of Listing 12.04. (DE 20 at 17). Grant contends that had the ALJ properly analyzed the "C" criteria, he would have concluded that Grant's impairments satisfied one or more of these criteria. Specifically, Grant argues that even a minimal increase in mental demands or a change in the environment would likely cause him to decompensate, which he contends is "evident in the medical opinions and treatment notes as well as [his] testimony and the third party reports." (DE 20 at 18).

While the ALJ could have explained his consideration of the "C" criteria to a greater degree at step three, it nevertheless is clear from reading the decision as a whole that the ALJ did not find that even a minimal increase in mental demands or a change in the environment would likely cause Grant to decompensate. *See generally Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) ("[T]idy packaging" is not required in ALJs' decisions because the courts read them "as a whole and with common sense." (citations omitted)). Here, the ALJ assigned great weight to Drs. Lovko's and Clark's opinions (AR 29), who opined that despite Grant's moderate limitations in concentration, social interaction, and adapting to changes in a work setting, Grant could "understand, remember, and carry-out unskilled tasks without special considerations in many work environments" and "manage the stresses involved with unskilled work" (AR 109-10, 123-24). Thus, the ALJ's conclusion that Grant did not satisfy this "C" criterion is adequately supported by the record. And as already concluded above, the ALJ also sufficiently supported his finding that Grant did not have a history of one or more years' inability to function outside a "highly supportive living arrangement" with an indication of

continued need for such arrangement.[8]

Moreover, the ALJ's conclusion that Grant did not meet the "B" or "C" criteria is supported by the opinion of Dr. Clark, who specifically concluded that Grant did not meet the "B" or "C" criteria of Listings 12.04 or 12.06.  (AR 119-120; *see* AR 29).  In her narrative, Dr. Clark specifically considered that Grant "lives alone in an apartment provided through a program through Park Center[.]"  (AR 124).  Of course, "[t]he ALJ may properly rely upon the opinion of these medical experts" when determining whether a claimant meets or equals a listing.  *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (citing *Scott v. Sullivan*, 898 F.2d 519, 524 (7th Cir. 1990)); *see also* SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996).

Therefore, the ALJ's step-three conclusion that Grant did not meet or equal a listing is supported by substantial evidence.

### E.  The RFC Assigned by the ALJ Is Supported by Substantial Evidence

Grant also argues that the ALJ failed to adequately account for all of his mental and physical limitations when assigning the RFC.

The RFC is a determination of the tasks a claimant can do despite his limitations.  20 C.F.R. § 416.945(a)(1).  The RFC assessment "is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence."  SSR 96-5p, 1996

---

[8] Grant does not argue that he satisfied the remaining "C" criterion—repeated episodes of decompensation, each of extended duration.  (*See* DE 20 at 16-18; DE 26 at 1-2).

WL 374183, at *5 (July 2, 1996); *see* 20 C.F.R. § 416.945. Therefore, when determining the

RFC, the ALJ must consider all medically determinable impairments, mental and physical, even

those that are non-severe. 20 C.F.R. § 416.945(a)(2); *see Craft v. Astrue*, 539 F.3d 668, 676 (7th

Cir. 2008). While an ALJ "may decide to adopt all of the opinions expressed in a medical source

statement, a medical source statement must not be equated with the administrative finding known

as the RFC assessment." SSR 96-5p, 1996 WL 374183, at *5. The determination of a claimant's

RFC is reserved to the Commissioner. *See Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007)

("[A]n ALJ is not required to rely entirely on a particular physician's opinion or choose between

the opinions [of] any of the claimant's physicians." (citation omitted)); 20 C.F.R. § 416.946(c);

SSR 96-5p, 1996 WL 374183, at *4.

1. <u>Mental RFC</u>

Grant argues that the mental RFC assigned by the ALJ fails to account for the following

mental imitations opined by Drs. Lovko and Clark: moderate limitations in completing a normal

workday and workweek without interruption from psychologically based symptoms and to

perform at a consistent pace without an unreasonable number and length of rest periods,

maintaining socially appropriate behavior and adhering to basic standards of neatness and

cleanliness, and setting realistic goals or making plans independently of others. (AR 108-10).

These limitations were included in Section I of the mental RFC worksheet completed by Drs.

Lovko and Clark.

However, the Seventh Circuit has held that "the ALJ may reasonably rely on the

examiner's narrative in Section III, at least where it is not inconsistent with the findings in the

Section I worksheet." *Capman v. Colvin*, 617 F. App'x 575, 579 (7th Cir. 2015); *see Varga v.*

*Colvin*, 794 F.3d 809, 816 (7th Cir. 2015) ("[A]n ALJ may rely on a doctor's narrative RFC, rather than the checkboxes, where that narrative adequately encapsulates and translates those worksheet observations." (citation omitted)); *see also Milliken v. Astrue*, 397 F. App'x 218, 221-22 (7th Cir. 2010); *Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002). Here, Drs. Lovko and Clark further indicated in their narrative section that Grant could "understand, remember, and carry-out unskilled tasks without special considerations in many work environments," "relate on at least a superficial and ongoing basis with co-workers and supervisors," "attend to task for sufficient periods of time to complete tasks," and "manage the stresses involved with unskilled work." (AR 110, 124). Therefore, the ALJ did not err by failing to expressly include in the RFC each limitation identified by Drs. Lovko and Clark in Section I of their mental RFC worksheet.

Grant further argues that the ALJ should have included "an inability to tolerate certain noise environments" due to his PTSD as evidenced in the treatment notes. (DE 20 at 20). For example, Grant reported to his therapist on one occasion that he had felt stressed from the loud noise of recent fireworks. (AR 870; *see also* AR 76). However, it is apparent that the ALJ considered Grant's complaints of noise sensitivity, at least to some extent; specifically, the ALJ noted that in May 2015 Grant reported riding a noisy bus could be difficult at times. (AR 709). The ALJ further considered, however, that Grant was still able to ride the bus to class. (AR 26, 709). Furthermore, Grant does not point to any medical source of record who assigned him a limitation concerning an inability to tolerate noisy environments. *See Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) ("[T]he primary responsibility for producing medical evidence demonstrating the severity of impairments remains with the claimant." (citation omitted)).

Finally, Grant argues that the ALJ's limitation in the RFC to "superficial interaction with coworkers, supervisors and the public" does not account for his difficulty just being around people due to his previous trauma. (DE 20 at 21). But this assertion, too, is a nonstarter. As explained above, the ALJ assigned great weight to Drs. Lovko's and Clark's opinions (AR 29), and these doctors concluded in their narrative that Grant could "relate on at least a superficial and ongoing basis with co-workers and supervisors" (AR 110, 124). As such, the ALJ's limitation to "superficial interaction with coworkers, supervisors and the public" is adequately supported by the record.

2. Physical RFC

Grant further argues that the ALJ failed to account for all of his physical limitations—more specifically, his limitations concerning his lower extremities. Grant contends the ALJ's finding at step two that his bilateral posterior tibial tendinitis with associated flatfeet was a severe impairment (AR 21), is inconsistent with the ALJ's failure to incorporate any lower extremity limitations in the RFC (AR 28).

There is no requirement, however, that an ALJ include limitations in an RFC just because he finds an impairment is severe at step two. Here, the ALJ explained why he did not incorporate any lower extremity limitations for Grant, as the ALJ pointed to numerous records that observed that Grant had no gait or strength deficits and that Grant's lower extremity complaints were adequately alleviated through treatment. (*See* AR 24-25, 393-95 (circulation, movement, and sensation intact for all extremities and was able to walk unassisted); 465 (flat footed, but no gait deviation); 566 (gait and station steady and upright, and able to walk on heels, toes, tandem walk, and hop on both feet)). Thus, the ALJ specifically considered Grant's complaints about his lower

extremities (AR 24-25) but concluded that they "were accommodated through treatment including orthotics" (AR 28).

Furthermore, in June 2014, Dr. Bacchus, an examining physician, specifically opined that Grant "retain[s] the physical functional capacity to perform regular duties." (AR 566). Likewise, Dr. Corcoran, a reviewing physician, opined in September 2014 that Grant could stand or walk six hours in an eight-hour workday. (AR 96). Dr. Corcoran's opinion was later affirmed by Dr. Sands. (AR 131). In fact, Grant fails to point to *any* medical source of record who assigned him lower extremity limitations. As explained earlier, "[i]t is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability." *Scheck*, 357 F.3d at 702 (citing 20 C.F.R. § 404.1512(c); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987)).

For these reasons, Grant's various challenges to the mental and physical RFC assigned by the ALJ do not require a remand of the ALJ's decision, as the RFC is supported by substantial evidence of record.

### F. The ALJ's Consideration of Dr. Hite's and Ms. Martin's Opinions Are Supported by Substantial Evidence

Finally, Grant asserts that the ALJ improperly weighed the opinions of Dr. Hite, a psychologist at Park Center, and Ms. Martin, a clinical social worker at Park Center. Grant contends that as treating sources, Dr. Hite and Ms. Martin should have been assigned more weight than the opinions of Drs. Lovko and Clark, the reviewing state agency psychologists.

1. Dr. Hite

Dr. Hite completed a one-page "Permanent Supportive Housing Verification of Disability Form" for Grant on May 18, 2014, representing that Grant was a homeless person with a qualifying disability.[9] (AR 804). In completing the one-page form, Dr. Hite represented that Grant had a mental, emotional or physical impairment that:

1.  As a result of his/her disability, the need for treatment is expected to be of a long, continued, and indefinite duration; AND
2.  The disability impedes his/her ability to live independently; AND
3.  Is of such a nature that the disability could be improved by more suitable housing conditions;

(AR 804), *or* that Grant had:

Problematic use/abuse of alcohol and /or drugs that 1) has occurred for at least 12 months and 2) has caused serious difficulties in interpersonal relationships as evidence by disruptions in employment, loss of housing, and/or loss of role in family structures or other important relationships.

(AR 804).

The ALJ expressly considered the one-page form completed by Dr. Hite, but ultimately assigned it "very limited weight." (AR 29). In explaining why, the ALJ first pointed out that the Commissioner is not bound by medical opinions from treating source opinions on issues reserved to the Commissioner. Indeed, although an ALJ may decide to adopt the opinions in a medical source statement concerning the ability of a claimant to perform work-related activities, the RFC assessment is an issue reserved to the ALJ. 20 C.F.R. § 416.945(e); SSR 96-5p, 1996 WL

---

[9] Although the parties refer to Dr. Hite as a treating or examining source, they do not cite to any other evidence from Dr. Hite in the record. (DE 22 at 22; AR 29). As such, it is unclear whether Dr. Hite ever actually evaluated or treated Grant.

374183, at *2 ("[A] medical source statement must not be equated with the administrative finding known as the RFC assessment."). Second, the ALJ stated that Dr. Hite's opinion was "based on standards of a supportive housing organization, and not the regulations and standards of the Agency." (AR 29) This is also correct, as "[d]eterminations of disability by other agencies do not bind the Social Security Administration . . . ." *Allord v. Barnhart*, 455 F.3d 818 (7th Cir. 2006); *see also Winstead v. Colvin*, No. 13 CV 7320, 2015 WL 4038906, at *8 (N.D. Ill. June 30, 2015).

Additionally, the ALJ viewed Dr. Hite's opinion as not well supported by the objective findings at Grant's mental status examinations and his improvement after beginning treatment at Park Center. The ALJ observed that Dr. Hite issued his opinion within just a few months of Grant beginning treatment at Park Center, and that Grant improved through his treatment at Park Center. (AR 29) Indeed, the ALJ's assessment of Grant's improvement is reflected in the record. Although Grant continued to work with his care team on managing his stressors, organizing his schedule, and improving his self esteem (AR 601-08, 627-49), Park Center's treatment notes reflect that by May 2015 Grant was "coping well," focusing on self improvement, riding the bus, attending school, socializing at the Carriage House, attending church, attending Alcoholics Anonymous meetings, enjoying walking outdoors, and striving to work out two times a week. (AR 709; *see also* AR 601, 631).

Accordingly, the ALJ's decision to assign very limited weight to the one-page form completed by Dr. Hite in May 2014 in support of Grant obtaining free housing is supported by substantial evidence.

2.      Ms. Martin

Grant also contends that the ALJ improperly discounted the mental medical source

statement penned by Ms. Martin in June 2015.  (AR 792-98).  The ALJ discounted the statement

because Ms. Martin is not an acceptable medical source under the regulations and because her

opinions within the statement were inconsistent with, and not well supported by, the objective

medical findings in Park Center's treatment notes.

Grant first argues that the ALJ was incorrect in considering the mental medical source

statement as solely from Ms. Martin because it was co-signed by Ms. Lothamer, a nurse

practitioner, and Dr. Lambertson.  While Ms. Martin and Ms. Lothamer are both considered

"other sources" under the regulations, *see Wyatt v. Astrue*, No. 1:11-cv-00874-MJD-JMS, 2012

WL 2358149, at *6 (S.D. Ind. June 20, 2012); 20 C.F.R. § 416.913(d); SSR 06-03p, 2006 WL

2329939, at *4-5 (Aug. 9, 2006) (explaining that opinions from "other sources" should be

evaluated using the applicable factors set forth in 20 C.F.R. § 416.927 for weighing medical

opinions from "acceptable medical sources"), Dr. Lambertson is an "acceptable medical source."

Grant argues that as such, the mental medical source statement should have been afforded greater

weight.

But the mere counter-signature of a doctor does not necessarily transform an evaluation

from a social worker into a treating source opinion from an acceptable medical source.  *See, e.g.*,

*Cooper v. Astrue*, No. 1:06-cv-1175-J DT-TAB, 2007 WL 2904069, at *3 (S.D. Ind. Sept. 27,

2007) (declining to afford controlling weight to an evaluation written by a social worker, but

counter-signed by a doctor, where there was no evidence that the doctor saw the claimant or that

the social worker consulted with the doctor in making her assessment).  Here, Grant does not

point to any evidence that Dr. Lambertson ever saw Grant.

And even if the mental medical source statement is considered a treating source opinion from an acceptable medical source, the ALJ adequately explained why he declined to afford the mental medical source statement greater or controlling weight. The ALJ found that the mental medical source statement was inconsistent with other substantial evidence of record. (AR 29). For example, Ms. Martin opined that Grant could adhere to basic standards of neatness and cleanliness 80-89% of the time, and interact appropriately with the general public and maintain socially appropriate behavior 70-79% of the time. (AR 29, 796). The ALJ viewed Ms. Martin's opinion as inconsistent with Grant's own statements that he has no difficulty with personal care, that he is able to use public transportation, and that he demonstrated at the hearing that he could meaningfully participate in the matter at hand. (AR 29, 45, 75, 267-69, 285-86); *see* 20 C.F.R. § 416.927(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion.").

The ALJ also viewed Ms. Martin's opinion as not well supported by the objective medical findings within Park Center's treatment notes reflecting normal mood, affect, thought content, orientation, demeanor, memory, insight, judgment, and perception. (AR 29 (citing AR 651-53, 668-70, 685-86, 692-93)); *see* 20 C.F.R. § 416.927(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion."). As such, the ALJ provided "good reasons" for discounting Ms. Martin's opinion, and he minimally articulated why he afforded Ms. Martin's mental medical source statement limited weight. *See Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) ("An ALJ must offer good reasons for discounting a treating physician's opinion." (citations and internal quotation marks omitted)).

Finally, Grant argues that the ALJ "interpreted" clinical findings when considering Grant's treatment notes, and in doing so, improperly "played doctor." (DE 20 at 24); *see generally Olsen v. Colvin*, 551 F. App'x 868, 874 (7th Cir. 2014) ("The cases in which we have concluded that an ALJ 'played doctor' are ones in which the ALJ ignored relevant evidence and substituted her own judgment." (citations omitted)). Here, the ALJ discussed the mostly benign clinical findings documented by the medical sources during Grant's visits, noting that they did not support the severe limitations articulated by Ms. Martin in her mental source statement. In doing so, the ALJ simply discussed the medical evidence in making her decision; he did not, as Grant suggests, play doctor. *See, e.g., Dixon*, 207 F.3d at 1178.

In sum, Grant has advanced copious arguments, apparently hoping that at least one would warrant a remand of the Commissioner's final decision. That is not the case, however. The Commissioner's final decision will be AFFIRMED.

## V. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is AFFIRMED. The Clerk is directed to enter a judgment in favor of the Commissioner and against Grant.

SO ORDERED.

Entered this 15th day of December 2017.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge